UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------
**DAVID C. HAMILTON,**

                                Petitioner,

        - against –

**SIRIUS SATELLITE RADIO INC.,**

                               Respondent.
------------------------------------

**04 Civ. 8394 (JGK)**

**<u>OPINION & ORDER</u>**

**JOHN G. KOELTL, District Judge**:

    The petitioner, David C. Hamilton ("Hamilton"), has filed a petition to vacate an award entered by an arbitrator of the American Arbitration Association ("AAA") in favor of the respondent, Sirius Satellite Radio Inc. ("Sirius"). (<u>See</u> <u>In the Matter of the Arbitration Between David C. Hamilton and Sirius Satellite Radio Inc.</u>, Award of the Arbitrator, dated Aug. 13, 2004 ("the award"), attached as Ex. 25 to Decl. of Jason S. Aschenbrand, dated Nov. 12, 2004 ("Aschenbrand Decl.").) Sirius opposes the petition and has cross-petitioned for confirmation of the award. The petition and cross-petition have been brought pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 9, 10. This Court has

subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the petitioner's underlying claim arises under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-54. The petitioner alleges that he was constructively discharged in violation of the FMLA because he had taken an FMLA leave.

I.

A.

The following facts are undisputed unless otherwise noted.

The arbitration that is the subject of this motion arose out of Hamilton's departure from his employment at Sirius. Hamilton was hired in April 1999 as a program manager to design and implement Sirius's terrestrial network. (Tr. of Dep. of David C. Hamilton, dated July 10, 2003 ("Hamilton Dep."), at 11, 19, attached as Exs. 5, 20A-C to Aschenbrand Decl.) As part of his employment, Hamilton agreed to be bound by Sirius's Mediation and Arbitration Policy. (Sirius Satellite Radio Inc.'s Mediation and Arbitration Policy, attached as Ex. E to Aff. of Steven I. Locke, dated Oct. 25, 2004 ("Locke Aff.").) Hamilton fulfilled his initial responsibilities well and received a promotion to Senior Program Manager after his first year at Sirius. (Tr. Of Dep. of Mark Gaudino, dated Oct. 23, 2003 ("Gaudino Dep."), at 107-08, attached as Exs. 6, 21A-B to Aschenbrand Decl.)

Following the birth of Hamilton's second child in early 2001 (Hamilton Dep. at 10), Hamilton requested some flexibility and accommodations in his work schedule so that he could assist his wife at home.  In January, he took two days of FMLA leave (Hamilton Dep. at 168) and later started telecommuting from home for about a one month-period pursuant to the terms of a written agreement (Hamilton Dep. at 168, 170).  After returning to work at Sirius's New York office for a brief period, he again telecommuted, this time from March to May 2001 from the offices of Globecomm Systems, Inc., a company involved in the implementation of the terrestrial network.  (Hamilton Dep. at 160; Tr. of Dep. of Andrew Patterson, dated Oct. 24, 2003 ("Patterson Dep."), at 125, attached as Exs. 7, 22A-B to Aschenbrand Decl.)  In May 2001, Hamilton asked Mark Gaudino ("Gaudino"), the Vice President in charge of Sirius's terrestrial network, if he could again telecommute from home because of difficulties his wife was having.  (Hamilton Dep. at 164.)  Gaudino rejected Hamilton's request, and Hamilton opted to take an FMLA leave from June 4, 2001, through the end of that August.  (Id. at 164-65; Patterson dep. at 135.)  Andy Patterson ("Patterson"), Hamilton's immediate supervisor (Hamilton Dep. at 25), was concerned that Hamilton's leave would increase the workload for others because the terrestrial network's implementation was approaching completion (Patterson Dep. at 19, 131), and

Gaudino informed Hamilton that it was a "bad time" to take leave (Gaudino Dep. at 159). Nonetheless, Hamilton took the FMLA leave.

Toward the end of Hamilton's leave, Gaudino advised him that the three-person terrestrial group would be eliminated by the end of the year because of budget cuts. (Hamilton Dep. at 55, 113; see Gaudino Dep. at 178.) Subsequently, Gaudino offered Hamilton severance in the form of salary through the end of November. Hamilton testified at his deposition:

> Q   What specifically did Mr. Gaudino say to you when he delivered the offer of the three-month package?
>
> A   Again, Mark reiterated that the position was not going to be in existence as of the end of the year, perhaps sooner, depending upon the next round of cuts. He put forth an offer -- I believe the final package ended up being 2-1/2 months. It was through the end of November, I believe.
>
> He put forth an offer of the package in which I could accept and depart Sirius.
>
> I could stay on and work in my position for a period of time after that, if I wished. And then I could take a delta of the package at the time that I decided to depart.
>
> Or I could stay through the end of the year and just receive my standard pay until that time.

(Hamilton Dep. at 58-59.)

Before accepting the severance, Gaudino and Patterson suggested that Hamilton look for a position in other departments at Sirius, and Hamilton expressed his interest in working in the marketing or content group. (Id. at 77-78, 81-

4

82, 96-98.) However, because these groups did not seem to be hiring, Hamilton decided that it did not make sense to stay with the company. (Id. at 97; see also id. at 84-85 (testifying that he did not inquire into a position in the operations group because of the position's travel requirements and Gaudino's opinion that he was not qualified for the position).) In his resignation letter, Hamilton thanked Gaudino and Patterson "for all the opportunities [they had afforded him] over the past 2-1/2 years" and wrote that he felt he "[had] been able to grow both on a personal and professional level" at Sirius through the trust shown him and the responsibilities given him. (Hamilton Dep. Ex. 1, dated July 10, 2003, attached as Ex. 8 to Aschenbrand Decl.) Hamilton's last day at Sirius was September 6 or 7, 2001. (Hamilton Dep. at 129.)

After he left the company, Hamilton learned that some employees of the terrestrial group had not been terminated and that an outside consultant had been hired, eventually as a full-time employee, to take over some of his past responsibilities. (Hamilton Dep. at 199-200; Patterson Dep. at 49, 51-52.)

B.

On June 3, 2002, Hamilton filed with the AAA a Request for Mediation that was subsequently converted to a Demand for

5

Arbitration, claiming that he was constructively discharged in retaliation for his exercising his right to FMLA leave. (Req. for Mediation, dated June 3, 2002, attached as Ex. 13 to Aschenbrand Decl.) In a twenty-page opinion, the arbitrator granted Sirius's motion for summary judgment and concluded that, as a matter of law, Hamilton never suffered an adverse employment action in violation of the FMLA. (Arbitration Award at 17, 19-20.) After outlining the requirements of a prima facie case of retaliation under the FMLA (Id. at 13), the arbitrator analyzed the standard for constructive discharge based on precedent from the Supreme Court, the Second Circuit, and the Seventh Circuit (Id. at 14-15 (considering constructive discharge law expounded in Pennsylvania State Police v. Suders, 542 U.S. 129 (2004), EEOC v. Univ. of Chicago Hosps., 276 F.3d 326 (7th Cir. 2002), Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62 (2d Cir. 2000), and Lopez v. S.B. Thomas, Inc., 831 F.2d 1184 (2d Cir. 1987), among others)). The arbitrator concluded that the petitioner had failed to introduce evidence sufficient to permit a rational trier of fact to infer that the working conditions were so intolerable as to compel a reasonable person to resign and that, accordingly, Hamilton had not suffered an adverse employment action as required to make out a prima facie case of retaliation under the FMLA. (Id. at 14, 16-17.) The arbitrator relied on Hamilton's resignation

letter thanking his supervisors. The arbitrator also relied on Hamilton's own testimony that he was faced with four choices at the time he resigned:

> 1) Resign immediately and be paid severance through the end of November 2001; 2) remain employed by the [r]espondent while looking for a job with another company and receive severance through the end of November 2001, if he found a job and resigned before then; 3) remain employed by the [r]espondent until his position was eliminated, most likely at the end of the year; or 4) remain employed by the [r]espondent and look for another position within the company.

(Id. at 16.)

Accordingly, the arbitrator granted Sirius's motion for summary judgment. (Id. at 17, 19-20.)

II.

The task for a party seeking to vacate an arbitration award is a formidable one. The party challenging an arbitration award generally bears a heavy burden of proof, and limited review of arbitration decisions is necessary both to effectuate the parties' agreement to submit their disputes to arbitration and to avoid costly and protracted litigation about issues the arbitrators have already decided. See, e.g., DiRussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 821 (2d Cir. 1997); Willemijn Houdstermaatschappij, BV v. Standard Microsys. Corp., 103 F.3d 9, 12 (2d Cir. 1997); In re Arbitration Between Space Sys./Loral, Inc. and Yuzhnoye Design Office, 164 F. Supp. 2d 397, 403 (S.D.N.Y. 2004); see also

Wedbush Morgan Sec., Inc. v. Robert W. Baird & Co., 320 F. Supp. 2d 123, 126 (S.D.N.Y. 2004).

A.

The petitioner argues that the award should be vacated because the arbitrator manifestly disregarded the law. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker, 808 F.2d 930, 933 (2d Cir. 1986) (explaining the judicially created doctrine of manifest disregard of the law). The Court of Appeals for the Second Circuit has repeatedly emphasized that review of an arbitration award for manifest disregard of the law is "severely limited," and "to modify or vacate an award on this ground, a court must find both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." Halligan v. Piper Jaffray, Inc., 148 F.3d 197, 202 (2d Cir. 1998) (internal quotations omitted); see also Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 389-91 (2d Cir. 2003); DiRussa, 121 F.3d at 821; Wedbush, 320 F. Supp. 2d at 126-27.

Review under the doctrine of manifest disregard of the law is not an inquiry into the correctness of the decision, and the "erroneous application of rules of law is not a ground for vacating an arbitrator's award, nor is the fact that an

8

arbitrator erroneously decided the facts." Siegel v. Titan Indus. Corp., 779 F.2d 891, 892-93 (2d Cir. 1985) (citations omitted); see Bobker, 808 F.2d at 933-34 (explaining that a court is "not at liberty to set aside an arbitration panel's award because of an arguable difference regarding the meaning or applicability of laws urged upon it"). Instead, the error must be "plainly evident from the arbitration record," Duferco, 333 F.3d at 388, such that it is "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." Bobker, 808 F.2d at 933; see also Wedbush, 320 F. Supp. 2d at 127.

The arbitration decision must be confirmed if there is "even a barely colorable justification for the outcome reached." In re Arbitration Between Andros Compania Maritima and Marc Rich & Co., A.G., 579 F.2d 691, 703-04 (2d Cir. 1978) (addressing an award where the arbitrators supported their conclusions in an opinion). Vacating an award for manifest disregard of the law is appropriate only in "those exceedingly rare instance where some egregious impropriety on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply." Duferco, 333 F.3d at 389.

Accordingly, in the last fifty-five years, the Court of Appeals for the Second Circuit has vacated some part or all of an arbitral award for manifest disregard of the law in only four of at least forty-eight cases. Id. These low odds are a

reminder that interference with arbitration awards would "thwart the usefulness or arbitration, making it the commencement, not the end, of litigation." Duferco, 333 F.3d at 389 (internal quotation marks omitted); Wallace v. Buttar, 378 F.3d 182, 191 (2d Cir. 2004) (describing the "sobering odds").

B.

The petitioner argues that the Court of Appeals for the Second Circuit has recognized a "more rigorous judicial review" when dealing with arbitration awards in the employment context. The petitioner relies on language from Halligan to support this assertion. Halligan, 148 F.3d at 201 (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 23 n.4 (1991); Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 232 (1987)).

In Halligan, although the court discussed the "unique concerns at issue with employment discrimination," it still applied the traditional manifest disregard of the law standard. GMS Group v. Benderson, 326 F.3d 75, 79 (2d Cir. 2003); see also Success Sys., Inc. v. Maddy Petroleum Equip., Inc., 316 F. Supp. 2d 93, 97-98 (D. Conn. 2004). Moreover, in cases decided after Halligan, the Court of Appeals has given "no indication that different standards apply to arbitral awards depending on the nature of the claims underlying them."

10

GMS Group, 326 F.3d at 79; see also Wallace, 378 F.3d at 192 (cautioning "against an over-broad reading of Halligan").[1] The Court of Appeals has not fashioned a different manifest disregard of the law standard.[2]

III.

The petitioner argues that the arbitrator disregarded the law when he relied solely on hostile work environment-sexual

---

[1] The Court of Appeals has also noted that the manifest disregard of evidence standard hinted at in Halligan is merely dicta. Wallace, 378 F.3d at 192-93; Westerbeke Corp. v. Daihatsu Motor Co., 304 F.3d 200, 213 & n.9 (2d Cir. 2002); see also Success Sys., 317 F. Supp. 2d at 97-98 (noting that such a standard "would threaten to undermine many of the benefits parties bargain for when they enter into arbitration agreements").

[2] Similarly, the petitioner's reliance on Fahnestock & Co. v. Waltman, 935 F.2d 512 (2d Cir. 1991), and Hardy v. Walsh Manning Sec., 341 F.3d 126 (2d Cir. 2003), is misplaced. The petitioner argues that these cases demonstrate a more rigorous standard of review for arbitration awards in employment cases. (Pet'r's Reply Mem. of Law in Further Support of His Mot. to Vacate the Arbitration Award and in Opposition to Resp't's Petition to Confirm the Award ("Pet'r Reply Mem."), at 4 n.2.) That is incorrect. In Fahnestock, the Court of Appeals affirmed the district court's decision to vacate a punitive damages award pursuant to 9 U.S.C. § 10(d) because that award exceeded the arbitrators' power. The decisions did not rest on a more rigorous application of the manifest disregard of the law standard. In Hardy, the Court of Appeals did not vacate the arbitration award but directed the district court to remand to the arbitration panel for clarification. Hardy, 341 F.3d at 134 (remanding an arbitration award where the arbitration panel misapplied respondeat superior in the employment context). Indeed, the Court of Appeals noted that manifest disregard of the law "requires more than a mistake of law or a clear error in fact finding." Id. at 133 (internal citation and quotation marks omitted). The Court of Appeals also noted: "We are reluctant to announce that the Award is void outright as written." Id. at 134.

harassment cases and ignored "imminent discharge" cases to find that Hamilton was not constructively discharged.

In order to make out a prima facie case of retaliation under the FMLA, the petitioner was required to present evidence that: "(1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004). The Supreme Court and the Court of Appeals for the Second Circuit have recognized the constructive discharge doctrine, according to which "an employee's reasonable decision to resign because of unendurable working conditions" is an adverse employment action for remedial purposes. See, e.g., Suders, 124 S. Ct. at 2351-52; Stetson v. NYNEX Serv. Co., 995 F.2d 355, 360-61 (2d Cir. 1993) (applying constructive discharge). The arbitrator held that, as a matter of law, Hamilton did not suffer an adverse employment action because he was not constructively discharged. (Arbitration Award at 16-17 (finding that the facts do not show "that the [petitioner] was constructively discharged" and granting the defendant summary judgment).)

The petitioner claims that resignation in the face of imminent discharge may constitute a constructive discharge

12

regardless of the circumstances of the employee's work environment. Moreover, the petitioner argues that the Court of Appeals for the Second Circuit "has recognized unequivocally that where an employee has been told that he will be terminated at the end of a 90-day period no matter what he did, this 'statement alone suffices to establish a constructive discharge.'" (Pet'r's Mem. of Law in Support of His Mot. to Vacate the Arbitration Award ("Pet'r Mem."), at 16 (quoting Lopez, 831 F.2d at 1188-89 (emphasis removed)).) The petitioner claims that, because he was allegedly faced with taking severance or being terminated, the facts in this case are like those in Lopez and are sufficient for a reasonable jury to find constructive discharge. (Pet'r Memo. At 19.) Accordingly, the petitioner argues, the arbitrator should not have decided on a motion for summary judgment that the petitioner was not constructively discharged. (Id. at 20-21.)

A.

The petitioner argues that the arbitrator manifestly disregarded the law because he did not recognize that a situation where an employee is offered severance pay as an alternative to termination constitutes a constructive discharge, without consideration of whether the working conditions were so unbearable as to lead a reasonable employee to leave. The law is not as clearly defined as the petitioner

implies.

The Court of Appeals for the Second Circuit has not held that that imminent discharge constitutes a separate means from intolerable working conditions of demonstrating constructive discharge. In Lopez, the Court of Appeals explicitly began with the traditional definition of a "constructive discharge":

> "A constructive discharge occurs when the employer, rather than acting directly, 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" To find that an employee's resignation amounted to a constructive discharge, "'the trier of fact must be satisfied that the . . . working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'"

Lopez, 831 F.2d at 1188 (citations omitted).

In Lopez, an employee's supervisor "burst into degrading and lewd obscenities [toward the employee,]" and the division manager, when told of the supervisor's outburst, suggested that the employee "resign" instead of assisting the employee. Lopez, 831 F.2d at 1186. The court held that, on the facts in Lopez, when the supervisor later told the employee that he would be fired after a 90-day probationary period "no matter what he did to improve his allegedly deficient performance," a trier of fact might find that the supervisor's "statement alone suffices to establish a constructive discharge." Id. at 1188. This finding was based on the existence of intolerable working conditions and was limited to the particular record in

Lopez where the employee was explicitly told that there was nothing he could do to keep working for the employer. See id. (noting that there was a genuine issue of fact as to constructive discharge based on "[t]he record in this case"); Stetson, 995 F.2d at 360 (discussing Lopez's application of the traditional intolerable working conditions standard and noting that Lopez's finding of constructive discharge was based on multiple facts evidencing intolerable working conditions).

In Chicago Hospitals, although the Court of Appeals for the Seventh Circuit suggested that communication to an employee that the employee will be terminated might be another method of demonstrating constructive discharge, it later emphasized that such communications "could have indeed been to a reasonable employee unbearable." Chicago Hosps., 276 F.3d at 331-32 (relying on other facts such as the use of the employee's office for storage, hostility toward the employee, and the packing of the employee's belongings by her employer). The court did not abandon the traditional standard for constructive discharge. Moreover, in Cigan v. Chippewa Falls Sch. Dist., 388 F.3d 331 (7th Cir. 2004), the Court of Appeals for the Seventh Circuit noted its concern with Chicago Hospitals. Addressing a party's reliance on language from Chicago Hospitals that "'[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she

15

will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge,'" the Court of Appeals noted that "[l]anguage such as this shows the danger of treating an opinion's exposition as if it were statutory text. This sentence generalizes from a situation that met the normal standard . . . ." Id. at 333 (quoting Chicago Hosps., 276 F.3d at 332) (emphasis added).

The arbitrator relied on the traditional definition of a constructive discharge as explained by the Supreme Court in Suders and followed by the Court of Appeals for the Second Circuit. By doing so, the arbitrator did not manifestly disregard the law.

### B.

Moreover, the arbitrator's opinion does not reflect manifest disregard of the law because there is a "colorable justification" for his conclusion that no rational trier of facts could have found that the petitioner's working conditions were so intolerable as to compel a reasonable person to resign. Andros Compania Maritima, 579 F.2d at 703-04; (Arbitration Award at 14, 16 ("[T]he [petitioner] has neither made any allegations nor provided any proof that his working conditions were difficult, unpleasant, or intolerable, let alone so difficult, so unpleasant, or so intolerable that a reasonable person would have felt compelled to resign.")

16

The petitioner relies on Lopez and notes that the facts in this case, if read in the light most favorable to Hamilton, are different but not distinguishable because Hamilton had to choose between termination in two and a half months or severance now. However, the arbitrator concluded that the petitioner's situation was not like the employee's situation in Lopez because Hamilton was not faced with these two stark options. Indeed, the arbitrator noted that Hamilton could have remained with Sirius and looked for another position within the company, distinguishing Lopez because there were things that Hamilton could do to avoid being terminated. Based on this and Hamilton's letter of resignation, the arbitrator concluded that no reasonable trier of fact could find that the petitioner was faced with two stark options as in Lopez or that the petitioner's working conditions were so intolerable that any reasonable employee would have left. Even construing the facts in the light most favorable to the petitioner,[3] there was sufficient support for this finding because Hamilton himself testified that he was free to--and indeed was encouraged to--look for another position at Sirius. (Hamilton Dep. at 77-78, 81-82, 97-98.)

The petitioner argues that this Court should vacate the judgment because "misapplication of the summary judgment

---

[3] See generally Neary v. Prudential Ins. Co., 63 F. Supp. 2d 208, 210 (D. Conn. 1999) (discussing the standard of review for a motion for summary judgment in the arbitration context).

17

standard in and of itself constitutes a manifest disregard of the law." (Pet'r Reply Mem. at 8 (relying on Neary v. Prudential Ins. Co., 63 F. Supp. 2d 208 (D. Conn. 1999)).) As explained above, however, there was no manifest disregard of the summary judgment standard. The arbitrator acknowledged the correct standard[4] and applied it faithfully. (Arbitration Award at 7, 11, 14, 16-17.) Moreover, the manifest disregard of the law standard is not a basis to correct errors of law, but only to vacate awards that manifestly disregard the law. This is not a case like Neary where the court found that it was "unquestionable that the arbitration panel manifestly disregarded the standard for summary judgment" and where the record "provide[d] overwhelming evidence to support an inference that [the employee] was wrongfully terminated." Id. at 210. Indeed, in Neary, the court noted many facts evidencing a genuine issue for the jury. Id. Unlike in Neary, the arbitrator's written decision clearly considers and applies the summary judgment standard: the arbitrator did not disregard the law, but rather reasonably found that no reasonable jury could have found a constructive discharge in

---

[4] "'[A] claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" (Arbitration Award at 14 (quoting Stetson, 955 F.2d at 361 (internal citations omitted)).)

18

this case.

Accordingly, the arbitrator's decision in this case does not meet the very high standard for manifest disregard of the law.

**CONCLUSION**

The Court has carefully considered all the arguments presented by the parties. Any argument not expressly discussed above is either moot or without merit. For the reasons stated above, the petitioner's petition to vacate the arbitration award is **denied,** and the cross-petition to confirm the arbitration award is **granted.** The Clerk of the Court is directed to enter judgment and to close this case.

**SO ORDERED.**

**Dated:** **New York, New York
June 24, 2005**

John G. Koeltl
United States District Judge